UNITED STATES of America,
Appellee,

v.

**Juan BOWIE, Appellant.**

No. 99–3060.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 2000.

Decided Dec. 1, 2000.

---

Jonathan Zucker, appointed by the court, argued the cause and filed the briefs for appellant.

Thomas S. Rees, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Alan M. Boyd, Assistant U.S. Attorneys.

Before: WILLIAMS, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Juan Bowie appeals his conviction for possession of counterfeit currency, claiming the district court improperly admitted evidence of his possession of counterfeit currency on an earlier occasion. We find the evidence admissible, though not on all the grounds cited by the district court, and therefore affirm the conviction.

I.

On May 16, 1997, a joint Federal Bureau of Investigation/Metropolitan Police Department narcotics task force executed a search warrant at a southeast Washington, D.C. apartment. During the search, an officer outside noticed Paul Little sitting in the passenger side of a parked green Pontiac with Tennessee plates, drinking a beer and listening to loud music. Little told the officer the car belonged to "Boo" and consented to a search. He also indicated that the driver was upstairs in the apartment building and motioned toward the apartment being searched. Officers found Bowie in the apartment. He identified himself as "Boo" but denied owning the Pontiac.

The search of the Pontiac turned up a large amount of counterfeit currency and several items linking Bowie to the car. More than $3,000 of counterfeit twenty and fifty dollar bills were inside a console between the driver's and passenger's seats, lying underneath a pager activation form signed by Juan Bowie and dated May 16, 1997. In the glove compartment was a Maryland traffic ticket issued ten days earlier. The ticket named Juan Bowie and indicated he was driving a car with the same Tennessee plates. The glove compartment also contained a court document bearing Bowie's printed name and what appeared to be his signature. An addition-

al $90 in counterfeit fifty and twenty dollar bills were inside the pocket of a black leather jacket in the trunk. The serial numbers on the counterfeit bills from the Pontiac's console and from the trunk were identical.

Secret Service agents summoned to the scene recognized the serial numbers on the bills as the subject of an ongoing investigation. They took Bowie to the Secret Service's Washington Office for questioning. Agents testified at trial that Bowie confessed to owning the money and the other items in the Pontiac and admitted that, using his brother Gary as an intermediary, he had paid somebody named Kevin $2,000 in genuine currency for $10,000 in counterfeit bills, $1,000 of which he had already spent. Despite his admission, the Secret Service found none of Bowie's fingerprints on the bills.

This was not Bowie's first arrest for possession of counterfeit money. One month earlier, police in Maryland caught Bowie with counterfeit bills identical to those seized on May 16. At 11:30 a.m. on April 17, 1997, Prince George's County police responded to an automobile accident involving Bowie. He was driving a Chevrolet Celebrity owned by a third party; with him was James Toler. The police arrested Bowie on an outstanding warrant and impounded the car because Toler, the passenger, did not have a valid driver's license. An inventory of the car turned up approximately $1,300 in counterfeit currency inside the pocket of a jacket. An officer found an additional $80 in counterfeit bills on Toler, but found none on Bowie. The serial numbers on all of these bills matched those on the counterfeit bills later seized on May 16. Inside the car was a bag containing a pair of Reebok shoes and Reebok socks as well as a receipt issued at 10:52 a.m. that day from a nearby Lady Footlocker store.

Later in the day of April 17, police recovered from the Laurel City Mall Lady Footlocker a $50 counterfeit bill bearing the same serial number as the other $50 bills seized from the Chevrolet Celebrity.

According to the manager of the Lady Footlocker, just before 11:00 that morning, a medium-built man wearing a black leather jacket purchased a pair of Reebok running shoes and Reebok socks with a $50 bill and a couple of twenties. The manager could not positively identify Bowie from a photo array as the man who had passed the counterfeit $50 bill. However, when Bowie and Toler were arrested with identical counterfeit bills a short distance away from the Laurel City Mall and only forty minutes after the Lady Footlocker transaction, Bowie was wearing a black leather jacket and Toler a green coat.

The indictment in this case charged Bowie with possessing counterfeit currency only on May 16, not on April 17. The prosecution sought to introduce evidence of the uncharged April 17 incident as prior acts evidence under Fed.R.Evid. 404(b). The district court admitted the evidence over Bowie's objection. As a result, a significant portion of the trial was devoted to Bowie's arrest on April 17, 1997, the discovery of counterfeit notes in the car and on the passenger that day, and the passing of a counterfeit bill at the Lady Footlocker. The jury convicted Bowie of possessing counterfeit obligations and he was sentenced to 41 months incarceration. Bowie's only argument on appeal is that admission of evidence of the April 17 incident violated Fed.R.Evid. 404(b).

## II.

■ Federal Rule of Evidence 404(b) prohibits "evidence of other crimes, wrongs, or acts * * * to prove the character of a person in order to show action in conformity therewith." It permits such evidence for purposes unrelated to the defendant's character or propensity to commit crime, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). When the government plans to introduce "bad acts" evidence, it must, upon request by the accused, give notice of the "general nature of any such evidence." *Id.* We review the district court's Rule 404(b) rul-

ings for abuse of discretion. *See United States v. Mathis*, 216 F.3d 18, 25–26 (D.C.Cir.2000); *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C.Cir.1997).

The district court admitted evidence of the April 17 incident on alternative grounds. The court first found the evidence not barred by Rule 404(b) on the basis that it was "inextricably intertwined" with Bowie's possession of counterfeit bills on May 16. Because the serial numbers on the bills seized in April tallied with those seized in May, the April evidence was, the court thought, "in some sense really evidence of the same crime." The court also found that the April evidence had permissible non-propensity purposes under Rule 404(b), chiefly to establish Bowie's intent to defraud and his knowledge of the bills' inauthenticity but also to corroborate his confession to the Secret Service.

### A.

■ We begin with the district court's ruling that Rule 404(b) did not apply to the April evidence. The court relied on a line of decisions in this and the other circuits holding that Rule 404(b) does not apply to evidence that is "inextricably intertwined" with the crime charged. *See, e.g., United States v. Allen*, 960 F.2d 1055, 1058 (D.C.Cir.1992). The theory is that because Rule 404(b) applies only to evidence of a defendant's *other* crimes, wrongs, or acts," it creates a dichotomy between crimes or acts that constitute the charged crime and crimes or acts that do not. Professors Wright and Graham explain: "One of the key words in determining the scope of Rule 404(b) is 'other'; only crimes, wrongs, or acts 'other' than those at issue under the pleadings are made inadmissible under the general rule." *See* 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5239, at 445 (1978). Courts have denominated

evidence of the same crime "intrinsic" and evidence of "other" crimes "extrinsic."

As a practical matter, it is hard to see what function this interpretation of Rule 404(b) performs. If the so-called "intrinsic" act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). The rule bars bad acts evidence only when the evidence is offered solely to "prove the character of a person in order to show action in conformity therewith." FED.R.EVID. 404(b). Evidence that constitutes the very crime being prosecuted is not of that sort. So far as we can tell, the only consequences of labeling evidence "intrinsic" are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request. *See* FED. R.EVID. 404(b) advisory committee's note on the 1991 amendment (indicating that the notice requirement does not apply to "intrinsic" evidence); FED.R.EVID. 105 (mandating, upon request, limiting instruction for multi-purpose evidence); *United States v. Lewis*, 693 F.2d 189, 197 (D.C.Cir.1982) (requiring a court to issue a limiting instruction without prior request only if the evidence "has the potential for substantially prejudicing the defendant."); *United States v. Miller*, 895 F.2d 1431, 1439 (D.C.Cir.1990).

Bifurcating the universe into intrinsic and extrinsic evidence has proven difficult in practice. Which of a defendant's acts should be considered the charged crime and which should not is often uncertain. In order to brighten the line separating intrinsic and extrinsic evidence, many courts have focused on the connection between a given crime or act and the charged crime. When evidence is "inextricably intertwined" with the charged crime, courts typically treat it as the same crime.[1] Every circuit now applies some formulation of the inextricably intertwined "test."

---

1. "Inextricably intertwined," "intricately related," "intimately related," and other variations on this theme are used by different courts to express the same concept, namely the interconnectedness between a given crime or act and the charged crime. We will use "inextricably intertwined" in this opinion be-

See United States v. Rodriguez–Estrada, 877 F.2d 153, 156 (1st Cir.1989); United States v. Carboni, 204 F.3d 39, 44 (2d Cir.2000); United States v. Gibbs, 190 F.3d 188, 217–18 (3d Cir.1999); United States v. Lipford, 203 F.3d 259, 268 (4th Cir.2000); United States v. Morgan, 117 F.3d 849, 861 (5th Cir.1997); United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir.1995); United States v. Hughes, 213 F.3d 323, 329 (7th Cir.2000); United States v. O'Dell, 204 F.3d 829, 833–34 (8th Cir.2000); United States v. Matthews, 226 F.3d 1075, 1082 (9th Cir.2000); United States v. O'Brien, 131 F.3d 1428, 1432 (10th Cir.1997); United States v. Smith, 122 F.3d 1355, 1359 (11th Cir.1997). This court has characterized evidence as inextricably intertwined with the charged crime in four cases. See United States v. Allen, 960 F.2d at 1058; United States v. Washington, 12 F.3d 1128, 1134–35 (D.C.Cir.1994); United States v. Badru, 97 F.3d 1471, 1473–75 (D.C.Cir.1996); United States v. Gartmon, 146 F.3d 1015, 1020 (D.C.Cir.1998).

As we have written, treating evidence as inextricably intertwined not only bypasses Rule 404(b) and its attendant notice requirement, but also carries the implicit finding that the evidence is admissible for all purposes notwithstanding its bearing on character, thus eliminating the defense's entitlement, upon request, to a jury instruction. See FED.R.EVID. 105. There is, as well, a danger that finding evidence "inextricably intertwined" may too easily slip from analysis to mere conclusion. What does the "inextricably intertwined" concept entail? When is a defendant's crime or act so indistinguishable from the charged crime that an item of evidence is entirely removed from Rule 404(b)?

We have not defined "inextricably intertwined" in the few Rule 404(b) cases in which we used those terms. See United States v. Allen, 960 F.2d at 1058; United States v. Washington, 12 F.3d at 1134–35; United States v. Badru, 97 F.3d at 1473–

75; United States v. Gartmon, 146 F.3d at 1020. Our sister circuits have attempted various formulations. The Seventh Circuit, for instance, examines "whether the evidence is properly admitted to provide the jury with a complete story of the crime on trial, whether its absence would create a chronological or conceptual void in the story of the crime or whether it is 'so blended or connected' that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." United States v. Hughes, 213 F.3d 323, 329 (7th Cir.2000). According to the Second Circuit, "evidence of uncharged criminal activity is not considered other crimes evidence under FED. R.EVID. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir.2000).

We do not find these formulations particularly helpful. Some are circular: inextricably intertwined evidence is intrinsic, and evidence is intrinsic if it is inextricably intertwined. Others are over-broad. The "complete the story" definition of "inextricably intertwined" threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could "complete the story" or "incidentally involve" the charged offense or "explain the circumstances." If the prosecution's evidence did not "explain" or "incidentally involve" the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant. See FED.R.EVID. 401 and 402.

The district court invoked the "res gestae" doctrine in finding the April 17 evidence inextricably intertwined with the charged crime. See 10/2/98 Tr. 98. To the extent this Latinism[2] was meant to suggest

cause the district court relied on it and it is recited more often in the case law.

2. See United States v. Krezdorn, 639 F.2d 1327, 1332 (5th Cir.1981) (stating that the inextricably intertwined doctrine is some-

that the April 17 evidence was outside Rule 404(b) because it "explained the events" or "completed the story," we do not agree. As we have said, all relevant prosecution evidence explains the crime or completes the story. The fact that omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether. Moreover, evidence necessary to complete a story—for instance by furnishing a motive or establishing identity—typically has a non-propensity purpose and is admissible under Rule 404(b). We see no reason to relieve the government and the district court from the obligation of selecting from the myriad of non-propensity purposes available to complete most any story.

We recognize that, at least in a narrow range of circumstances not implicated here, evidence can be "intrinsic to" the charged crime. Rule 404(b), for instance, would not have barred testimony from a witness who saw Bowie put the counterfeit currency in the Pontiac's console. Although such testimony relates to one of defendant's acts, the act is the charged crime of possessing counterfeit currency.[3] *See, e.g., Badru,* 97 F.3d at 1474–75 (evidence "offered as direct evidence of the fact in issue" is not an "other" crime). In other words, if the evidence is of an act that is part of the charged offense, it is properly considered intrinsic. In addition, some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime. *See* 22 WRIGHT & GRAHAM, *supra,* § 5239, at 446–47 (noting that the "inseparable crimes" interpretation of Rule 404(b)'s "other" crimes language "seems justifiable when used to cover situations where the seller of contraband must necessarily be shown to have possessed it. . . .").

On the other hand, we are confident that there is no general "complete the story" or "explain the circumstances" exception to Rule 404(b) in this Circuit. Such broad exclusions have no discernible grounding in the "other crimes, wrongs, or acts" language of the rule. Rule 404(b), and particularly its notice requirement, should not be disregarded on such a flimsy basis.

▮ As to Bowie's case, we do not see how his acts on April 17 constituted the same crime as that charged in the indictment. The authorities seized the counterfeit bills he had in possession on April 17, so the bills he possessed on May 16 could not have been the same ones. *Contrast United States v. Towne,* 870 F.2d 880, 886 (2d Cir.1989) ("The continuous possession of the same gun does not amount to a series of crimes, but rather constitutes a single offense."). All of the bills—those recovered in April and those seized in May—were doubtless from the same supplier and possibly the same batch, and the evidence indicated that Bowie purchased them at one time. But the indictment charged him only with possession of the counterfeit bills found on May 16. Given the charge, the April evidence was relevant, for reasons we give later. But it cannot be that all evidence tending to prove the crime is part of the crime. If that were so, Rule 404(b) would be a nullity. While we therefore disagree with the district court that the April evidence was outside Rule 404(b), we agree with the court's alternative ruling that the government satisfied Rule 404(b).

### B.

▮ Rule 404(b) is a rule of inclusion rather than exclusion. "[A]lthough the first sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite per-

---

times labeled *res gestae,* "an appellation that tends merely to obscure the analysis underlying the admissibility of the evidence.").

**3.** As noted earlier, the "intrinsic" label is unnecessary, as such evidence by nature does not "prove the character of a person in order to show action in conformity therewith." It is thus admissible whether viewed as "intrinsic" or as containing no propensity inference.

missive,' prohibiting the admission of other crimes evidence 'in but one circumstance'—for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C.Cir.1998) (en banc) (*Crowder II*), quoting *United States v. Jenkins*, 928 F.2d 1175, 1180 (D.C.Cir.1991). Compliance with Rule 404(b) does not itself assure admission of the other crimes evidence. If the defendant moves under Rule 403, the court may exclude the evidence on the basis that it is "unfairly prejudicial, cumulative or the like, its relevance notwithstanding." *See Old Chief v. United States*, 519 U.S. 172, 179, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The Supreme Court made much the same point in *Huddleston v. United States*, 485 U.S. 681, 688, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988): if evidence is offered for a proper purpose under Rule 404(b), "the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403."

■ Rule 404(b) thus is not so much a character rule as a special aspect of relevance, constituting but one of many exceptions to the general rule that "all relevant evidence is admissible." FED.R.EVID. 402. The rule does not prohibit character evidence generally, only that which lacks any purpose but proving character. *See Crowder II*, 141 F.3d at 1206. A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity? If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403. Stated more formally, a Rule 404(b) objection will not be sustained if: 1) the evidence of other crimes or acts is relevant in that it has "any tendency to make the existence of any . fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," FED.R.EVID. 401; 2) the fact of consequence to which the evidence is directed relates to a matter in issue other than the defendant's character or propensity to commit crime; and 3) the evidence is sufficient to support a jury finding that the defendant committed the other crime or act, *see Huddleston v. United States*, 485 U.S. 681, 689–90, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). *See also United States v. Mathis*, 216 F.3d 18, 26 (D.C.Cir. 2000); *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C.Cir.1997); *United States v. Washington*, 969 F.2d 1073, 1080–81 (D.C.Cir.1992).

■ In light of this standard, the district court properly admitted evidence of the April 17 incident to show Bowie's intent and knowledge. To convict Bowie under 18 U.S.C. § 472,[4] the government had to prove three elements: possession of counterfeit notes, intent to defraud, and knowledge the notes were counterfeit. *See, e.g., Albillo–Figueroa v. INS*, 221 F.3d 1070, 1073 (9th Cir.2000); *United States v. Bolin*, 35 F.3d 306, 309 (7th Cir. 1994). Intent and knowledge were therefore facts of consequence to the case. Evidence that Bowie possessed and passed counterfeit notes on a prior occasion was relevant because it decreased the likelihood that Bowie accidentally or innocently possessed the counterfeit notes on May 16. *See* FED.R.EVID. 401; *United States v. Burch*, 156 F.3d 1315, 1324 (D.C.Cir.1998). Intent and knowledge are also well-established non-propensity purposes for admitting evidence of prior crimes or acts. *See* FED.R.EVID. 404(b). The government presented sufficient evidence for a jury to conclude that Bowie possessed counterfeit currency on April 17 and passed a counterfeit note that day at the Laurel City Mall Lady Footlocker. The government established that a person matching Bowie's description passed a counterfeit bill with the

---

**4.** Title 18, U.S.C. § 472 states: "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than fifteen years, or both."

same serial number as on the bills found in the car Bowie was driving and on his passenger. Although the police found no counterfeit bills on Bowie's person, the jury heard testimony that the man passing the bill wore a black leather jacket, and that when Bowie and Toler were arrested barely forty minutes later with matching counterfeit bills and a receipt from the Lady Footlocker, Bowie was wearing a black leather jacket and Toler a green coat.

■ This much Bowie does not contest. Rather, he claims that the district court inadequately weighed the probative value of the evidence against its potential for unfair prejudice. Evidence of other crimes or acts having a legitimate nonpropensity purpose undoubtedly may contain the seeds of a forbidden propensity inference. Recognizing this possibility, we have consistently stated that Rule 403 may bar evidence otherwise admissible under Rule 404(b). *See, e.g., United States v. Mathis*, 216 F.3d 18, 26 (D.C.Cir.2000). We do not, however, prescribe any specific form this balancing must take, and will not reverse for failure to make a formal Rule 403 finding if the applicable considerations are apparent from the record. *See United States v. Gartmon*, 146 F.3d 1015, 1022 (D.C.Cir.1998); *United States v. Washington*, 12 F.3d 1128, 1135 (D.C.Cir.1994). Bowie's claim that the district court performed no Rule 403 analysis at all regarding intent and knowledge is belied by the record. The court may not have recited Rule 403 verbatim, but it expressly considered the probative value versus the risk of unfair prejudice before admitting evidence of the April 17 events. *See* 11/10/98 Tr. 23–24; *United States v. Gartmon*, 146 F.3d 1015, 1022 (D.C.Cir.1998).

■ On the probative value side of the balance, Bowie claims that his offer to stipulate deprived evidence of intent and knowledge of its probative force because "those issues were not even contested." Brief of Appellant at 24. Before trial, Bowie orally offered to stipulate that whoever possessed the currency seized on May 16 had the requisite intent to defraud and guilty knowledge, but Bowie never presented a proposed written stipulation or a jury instruction.[5] Two months before trial, Bowie told the court that "we'll stipulate to whoever had the intent knew it was—we're not going to put at issue that whoever had it didn't know it was counterfeit." 10/2/98 Tr. 96. Five weeks later, he stated that "if you want intent, we'll stipulate to intent. If you want knowledge, we'll stipulate to knowledge. We'll stipulate to absence of mistake.... Knowledge can be just about anything [the prosecutor] wants as far as the intent to defraud or the intent or the absence of mistake or knowledge." 11/10/98 Tr. 20–21. Bowie's offers encompassed only intent and knowledge, not corroboration: he never offered to stipulate that he confessed to owning the money and other items found in the Pontiac on May 16 and to having paid $2,000 in genuine currency for $10,000 in counterfeit.

Whatever merit Bowie's stipulation argument had before, *see United States v. Crowder*, 87 F.3d 1405 (D.C.Cir.1996) (en banc) (*Crowder I*), vacated, 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997), recent cases in this court and the Supreme Court have eviscerated its conceptual underpinnings. We briefly adopted Bowie's reasoning in *Crowder I* but later discarded it in light of *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). In *Crowder II*, we held that "a defendant's offer to stipulate to an element of an offense does not render the government's other crimes evidence inadmissible under Rule 404(b) to prove that element, even if the defendant's proposed stipulation is unequivocal, and even if the defendant agrees to a jury instruction of the

---

5. Bowie suggested at one point that a "must-charge" jury instruction like that discussed in *United States v. Crowder*, 87 F.3d 1405 (D.C.Cir.1996) (en banc), vacated, 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997), would do. He did not offer his own jury instruction or one from a case that has not been overruled.

sort mentioned in [*Crowder I*]." *Crowder II*, 141 F.3d at 1209. Following the Supreme Court's lead in *Old Chief*, we reiterated that evidence may be relevant under the Federal Rules of Evidence whether or not the issue it relates to is disputed. *See* 141 F.3d at 1206; *see also Old Chief*, 519 U.S. at 179, 117 S.Ct. 644 (evidence going to an undisputed fact may be relevant, and "its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding"). We concluded that offers to stipulate may figure into the Rule 403 balancing, but cautioned that such offers are not determinative. *See* 141 F.3d at 1210.

 Bowie's stipulation argument is identical to the one we rejected in *Crowder II*. In the district court, Bowie tried to deflect the impact of that case by arguing that "based on *Crowder I*, we could offer to stipulate and give a must-charge instruction and in so doing estop the government from introducing that. All *Crowder II* has done is said no, we're not going to let the defendant make the choice. We're going to let the Court make the choice." 11/10/98 Tr. 20–21. Bowie's supposition misses the fundamental point of *Old Chief* and *Crowder II*, which is that evidence of undisputed issues may be relevant *and* highly probative regardless of the defendant's willingness to concede certain points. *Crowder II* does not, as Bowie insists, transfer the power to "estop" the government from the defendant to the district court; rather, it denies that offers to stipulate confer any such power at all. To exclude relevant evidence based on an offer to stipulate, the district court must do so under Rule 403, mindful of the Supreme Court's admonition in *Old Chief* of the central role of narrative integrity and our instruction in *Crowder II* that an offer to stipulate does not automatically tilt the Rule 403 balance. *See Old Chief*, 519 U.S. at 187–89, 117 S.Ct. 644; *Crowder II*, 141 F.3d at 1210.

Aside from the conceptual deficiencies in Bowie's argument, the stipulations he offered are indistinguishable from the offers to stipulate that we rejected in *Crowder II* as wholly insufficient. In *Crowder II*, the defendants offered to concede "only that 'anybody who possessed those drugs possessed them with the intent to distribute'." *See* 141 F.3d at 1208. Similarly, Bowie offered to stipulate that some hypothetical person in possession of counterfeit currency had the requisite intent and knowledge. *Crowder II* is so closely on point to Bowie's proposed stipulation that we can transplant wholesale the reasoning from that case, changing only the defendant's name and the label of the crime. As in *Crowder II*, some hypothetical individual was not on trial, Bowie was. And it was Bowie's intent and knowledge, not "anybody's," that the prosecution had to establish to the jury's satisfaction. Yet the prosecution's evidence of Bowie's prior counterfeit currency possession—a possession so close in time and circumstance to that charged in the indictment—was not meant to show that *someone* had intent and knowledge. The evidence was introduced to prove that Bowie had the intent to defraud and that Bowie knew what he was possessing. Bowie's proposed stipulation could not possibly have substituted for such proof. It did not even mention him by name. Far from a choice between "propositions of slightly varying abstraction," the choice in this case was between concrete evidence of the defendant's actions giving rise to natural and sensible inferences, and abstract stipulations about hypothetical persons not on trial. *See Crowder II*, 141 F.3d at 1208.

 Bowie's offer to stipulate contains yet another fatal defect. The district court admitted the prior crimes evidence in part to corroborate Bowie's confession.[6] Yet Bowie never offered to stipulate that he told the Secret Service that he owned the counterfeit currency and other items found in the Pontiac on May 16 and that he had paid $2,000 in genuine currency for

**6.** Bowie has not argued against the admission of his confession.

$10,000 in counterfeit. The April evidence corroborates the last element of Bowie's confession because it increases the probability that Bowie did buy $10,000 in counterfeit currency for $2,000 in genuine currency. *See* Fed.R.Evid. 401. Adding the money seized in April (approximately $1,400) to that seized in May (approximately $3,100) gets us closer to the $10,000 Bowie said he bought, less the $1,000 he said he spent. Although Rule 404(b) does not explicitly list corroboration among its examples of non-propensity purposes, evidence of other crimes or acts is admissible to corroborate evidence that itself has a legitimate non-propensity purpose. *See United States v. Everett,* 825 F.2d 658, 660 (2d Cir.1987); *United States v. Wimberly,* 60 F.3d 281, 285 (7th Cir.1995); *United States v. Pitts,* 6 F.3d 1366, 1370–71 (9th Cir.1993); *United States v. Blakeney,* 942 F.2d 1001, 1018–19 (6th Cir.1991); *United States v. Jiminez,* 224 F.3d 1243, 1250 (11th Cir.2000); *United States v. McLean,* 138 F.3d 1398, 1405 (11th Cir.1998).[7] Bowie's stipulation argument fails to recognize the legitimacy of corroboration as a non-propensity purpose. To merit consideration, an offer to stipulate must, at a minimum, address all legitimate uses of a piece of evidence. *See, e.g., United States v. Johnson,* 40 F.3d 436, 441 n.3 (D.C.Cir. 1994).

As in *Crowder II,* the April evidence had "multiple utility." 141 F.3d at 1208. It not only tended to establish Bowie's intent and knowledge, but also corroborated Bowie's confession to the Secret Service. A "piece of evidence," the Court wrote in *Old Chief,* "may address any number of separate elements, striking hard just because it shows so much at once." *Old Chief,* 519 U.S. at 187, 117 S.Ct. 644.

Bowie's arguments on the prejudice side of the Rule 403 balance warrant only a few words. Contrary to his claim that the prior crimes evidence threatened to mislead the jury because Bowie had not been convicted, the chain of inferences connecting Bowie to the money on April 17 was easily within the jury's reach. *See supra* pp. 930–31; *see also* Weinstein's Federal Evidence § 404.21[2][b] (1997) ("extrinsic evidence need not establish that other criminal activity resulted in a conviction"). As for Bowie's argument that the prior crimes evidence created a substantial risk of convicting him based on character evidence, the district court did not abuse its discretion in finding that the risk of unfair prejudice did not substantially outweigh its probative value. *See* Fed.R.Evid. 403.

In sum, neither Rule 404(b) nor Rule 403 barred admission of the April 17 evidence to prove Bowie's intent and knowledge and to corroborate his confession to the Secret Service.

*Affirmed.*

---

7. Some courts have imposed additional requirements for bad acts evidence introduced for the purpose of corroboration, requiring that the corroboration be direct and the corroborated matter be significant. *See, e.g., United States v. Everett,* 825 F.2d 658, 660 (2d Cir.1987); *United States v. Pitts,* 6 F.3d 1366, 1370–71 (9th Cir.1993). We see no reason to create such special rules. The underlying concerns are properly addressed through Rule 403.